UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| (1) Michael Erber,<br><br>Plaintiff,<br><br>vs.<br><br>(1) The Williams Companies, Inc.;<br>(2) Williams Partners, L.P.;<br>(3) Williams Partners GP LLC;<br>(4) Alan S. Armstrong; and<br>(5) Donald R. Chappel,<br><br>Defendants. | Case No. 16-CV-131-JEP-FHM<br><br><br>**JURY TRIAL DEMANDED** |

<u>**CLASS ACTION COMPLAINT**</u>

Michael Erber ("Plaintiff") alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon counsel's investigation, which includes review and analysis of: (a) regulatory filings with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports; (c) securities analyst reports; and (d) other public information.

I.  **INTRODUCTION**

1.      Plaintiff and the other members of the Class of purchasers of Defendant Williams Partners L.P. ("WPZ") common units during the period May 13, 2015 through June 19, 2015 (the "Class Period") were duped into purchasing their WPZ common units at artificially inflated prices by the material misrepresentations made by WPZ, The Williams Companies, Inc. ("WMB"), Williams Partners GP LLC ("Williams Partners GP"), Alan S. Armstrong ("Armstrong"), and Donald R. Chappel ("Chappel"). WPZ, WMB, Williams Partners GP, Armstrong, and Chappel are collectively referred to herein as "Defendants."

1

2.     WMB controls WPZ through WPZ's general partner, Williams Partners GP. Specifically, all of WMB's senior officers are also senior officers of Williams Partners GP and six of WMB's senior officers (including Defendant Armstrong and Defendant Chappel) are directors of Williams Partners GP.  As a limited partnership, WPZ does not have directors or officers.  Instead, Williams Partners GP manages WPZ's operations and activities.

3.     On the morning of May 13, 2015, WMB and WPZ issued a joint press release announcing the execution of an agreement under which WMB would acquire all publicly-held WPZ common units in an all stock-for-unit transaction at a 1.115 ratio of WMB common share per WPZ common unit (the "WPZ/WMB merger").  The announcement did not disclose, or even hint, that WMB had considered or, in fact, was considering alternate strategic transactions that could prevent WMB from completing the WPZ/WMB merger.

4.     To the contrary, Defendants, including Defendant Armstrong and Defendant Chappel, expressed their excitement about the proposed WPZ/WMB merger, promoting investor confidence that the deal would be completed.

5.     Investors were energized by the proposed WPZ/WMB merger.  The price of WPZ common units immediately rose 22.7% on the day that the deal was announced.

6.     Unknown to the investing public, however, WMB management, led by Defendant Armstrong, had been and were still in discussions with Energy Transfer Equity L.P. ("ETE"), that were sanctioned by the WMB Board of Directors (the "WMB Board"), concerning ETE's proposal to acquire WMB.

7.     In fact, ETE had spent at least six months in pursuit of an acquisition of WMB. Defendants were aware of ETE's strong interest in acquiring WMB, reflected through

discussions between Defendant Armstrong and Defendant Chappel and high-level representatives of ETE that occurred prior to the announcement of the WPZ/WMB merger.

8.      Defendants were also aware that ETE was not interested in acquiring the publicly-held WPZ common units as a part of an acquisition of WMB because ETE's preferred business strategy called for its master limited partnerships, like WPZ, to be separately traded.  And, Defendants knew that the WMB shareholders would not approve a WPZ/WMB merger if an offer from ETE was available as an alternative.

9.      Because the discussions between WMB and ETE management were ongoing at the time of the WPZ/WMB merger announcement, ETE reacted swiftly to that announcement. On May 19, 2015, Defendant Armstrong received a written offer from ETE to acquire WMB at an implied price of $64.00 per WMB common share.  ETE's offer was conditioned on WMB terminating the WPZ/WMB merger agreement.

10.      Defendant Armstrong presented that offer to the WMB Board the next day. During the WMB Board's process of formally considering the ETE offer, certain WMB Board members questioned whether they had received all material information from WMB management when considering and approving the WPZ/WMB merger agreement.

11.      Frustrated with WMB's slowness in responding to its offer and the market not knowing of its offer, ETE, prior to the opening of trading on June 22, 2015, publicly announced its offer, the requirement that WMB terminate the WPZ/WMB merger agreement, and details concerning its months-long pursuit of WMB.  ETE stated that, after the announcement of the WPZ/WMB merger, it "believed that it had no other choice but to provide the detailed terms of its interest" in WMB to the WMB Board.  In fact, completion of the WPZ/WMB merger would present an economic hurdle to ETE acquiring WMB because collapsing the structure of WMB

would conflict with ETE's preferred structure of holding separately traded master limited partnerships. ETE stated that it was disappointed that it was forced into a position to publicly confirm its offer for WMB.

12.     The public revelation of ETE's pursuit to acquire WMB surprised WPZ unitholders, causing an immediate sell-off. As a result of this material news, the price of WPZ units fell 7.6% on the day of the announcement.

13.     On the opposite side, securities analysts and WMB investors immediately recognized the strength of ETE's offer for WMB. The price of WMB common shares jumped almost 26% the day ETE's offer was announced.

14.     The market's reaction to the announcement of ETE's offer to acquire WMB signaled that the WPZ/WMB merger would not be approved by the WMB shareholders. And in fact, WMB's Board acknowledged, when ultimately terminating the WPZ/WMB merger agreement, that WMB shareholders would not approve the WPZ/WMB merger agreement while the ETE offer was pending.

15.     Defendants were aware that knowledge of ETE's ongoing pursuit of WMB would have been material to Plaintiff and the Class when they purchased their WPZ common units and that Plaintiff and the Class would be misled without that information. Had Defendants made complete and accurate disclosures of all material information when they announced the WPZ/WMB merger agreement, WPZ investors would have appreciated that ETE's interest in WMB substantially reduced the probability that the WPZ/WMB merger would be completed. WPZ investors would not have acquired WPZ common units or would have substantially discounted the price of WPZ common units to account for that information.

16.     Instead, due to Defendants' false, misleading, and incomplete statements, the price for WPZ common units was artificially inflated.  Plaintiff brings this action to recover for himself and on behalf of the Class the substantial damages that resulted from Defendants' wrongful conduct.

## II.    PARTIES

17.     Plaintiff Michael Erber purchased WPZ common units on the New York Stock Exchange ("NYSE") throughout the Class Period at prices ranging from $52.96 to $53.15.  He suffered damages as a result of the violations of the federal securities laws alleged herein.

18.     Defendant The Williams Companies, Inc. (defined above as "WMB") is a corporation iunder the laws of the State of Delaware with its principal executive offices located in Tulsa, Oklahoma.

19.     Defendant Williams Partners L.P. (defined above as "WPZ") is a master limited partnership ("MLP") organized incorporated under the laws of the State of Delaware with its principal executive offices located in Tulsa, Oklahoma.

20.     WPZ and WMB are collectively referred to herein as the "Entity Defendants".

21.     Defendant Williams Partners GP LLC (defined above as "Williams Partners GP") is a limited liability company organized under the laws of the State of Delaware with its principal executive offices located in Tulsa, Oklahoma.  Defendant Williams Partners GP is the general partner of WPZ.

22.     Defendant Alan S. Armstrong (defined above as "Armstrong") has been employed by WMB for almost thirty years and has served as president, chief executive officer, and as a director of WMB since January 2011.  Defendant Armstrong also serves as chairman of the board and chief executive officer of Williams Partners GP, although ETE has recently

announced its intention to remove Defendant Armstrong from his position as chief executive officer of Williams Partners GP.

23.     Defendant Donald R. Chappel (defined above as "Chappel") has served as senior vice president and chief financial officer of WMB since April 2003.  Defendant Chappel also serves as chief financial officer and as director of Williams Partners GP.

24.     Armstrong, Chappel, WMB and Williams Partners GP are collectively referred to herein at the "Control Person Defendants".

## III.     JURISDICTION AND VENUE

25.     The claims on behalf of the Class (defined below) arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) ("Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5.  This Court has jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa; and 28 U.S.C. §§ 1331 and 1337.

26.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c) and (d).  WPZ, WMB and Williams Partners GP maintain their corporate offices in this District and many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.

27.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, interstate telephone communication, and the facilities of a national securities market.

IV.     **FACTUAL BACKGROUND**

A.     **WPZ and WMB**

28.     WPZ is a large-cap master limited partnership providing infrastructure for North American natural gas and natural gas products.  Williams Partners GP is the general partner of WPZ.

29.     WMB, which is one of the largest energy infrastructure companies in North America, owns 100% of Williams Partners GP and approximately 60% of the WPZ common units.  Also, through its ownership of Williams Partners GP, WMB has incentive distribution rights ("IDRs") in WPZ.  IDRs are rights to an increasing share in the incremental distributable cash flow a partnership generates.  Thus, WMB not only receives regular distribution from its WPZ common units, but also it is entitled to a higher proportion of WPZ's quarterly distribution.

B.     **Announcement of the WPZ/WMB merger agreement**

30.     On the morning of May 13, 2015, WMB and WPZ issued a joint press release announcing the execution of an agreement under which WMB would acquire all publicly-held WPZ common units in an all stock-for-unit transaction at a 1.115 ratio of WMB common share per WPZ common unit.  The press release quoted Defendant Armstrong as stating that the merger would "provide immediate benefits to [WMB] and [WPZ] investors."

31.     By announcing that WMB and WPZ would collapse their structure by having WMB acquire WPZ, WMB signaled to the market that it would pursue its growth strategy through vertical combinations of natural gas infrastructure assets into WMB, as opposed to by having WMB take controlling interests in separately traded MLPs.

32.     Later on May 13, 2015, WMB and WPZ held a joint "Analyst Day" conference during which representatives of the companies discussed the proposed merger with securities analysts.  Defendant Armstrong stated that "we couldn't be more excited about…the transaction

we just got done [i.e., the proposed merger]." He also touted the benefits to WPZ unit holders, stating: "We paid a premium to buy in the WPZ units, or will pay a premium when we close. The WPZ unitholders will enjoy the benefits of that premium. They'll enjoy the benefits of the dividend increase that we announced today. We expect they'll enjoy the uplift in Williams stock, so will enjoy all those things."

33. Similarly, Defendant Chappel highlighted that the proposed merger would create value for WPZ investors, including by lowering WPZ's cost of capital, which had increased due to the burden imposed by WMB's IDRs in WPZ. He also explained that WPZ's investors would enjoy "much greater liquidity."

34. Defendant Chappel was also directly asked whether "anything transpire[d] recently that changed [his] mind that now is the time to" collapse WPZ into WMB, which provided Defendant Chappel a clear opportunity to acknowledge that WMB had been considering other strategic alternatives and had been in discussions with a third party interested in acquiring WMB. However, Defendant Chappel did not make those disclosures.

35. However, Defendant Chappel did acknowledge, several times, that the market for WPZ common units had responded very favorably to the announcement of the merger. For example, he emphasized that, "[i]n terms of WPZ, I think you can see on the screen how WPZ has reacted today, and obviously investors are excited about the transaction."

36. In fact, in response to the announcement of the proposed merger, the price for WPZ units jumped dramatically from a $47.40 per unit closing price on May 12, 2015 to $58.16 per unit closing price on May 13, 2015, a 22.7% single-day increase.

37. WPZ investor enthusiasm was, however, misplaced because Defendants did not disclose their knowledge that ETE had been in a months-long pursuit of WMB and that ETE was

not interested in acquiring the publicly-traded WPZ common units.  Had Defendants disclosed that information, WPZ investors would have appreciated that ETE's interest in WMB substantially reduced the probability that the WPZ/WMB merger would be completed.  WPZ's potential buyers would have declined to invest of would have discounted the price of WPZ common shares to account for that information.

38.     Instead of Defendants disclosing ETE's pursuit of WMB, Defendant Chappel boosted investor confidence that the proposed WPZ/WMB merger would be completed by stating that "[w]e'd have a mailing to [WMB] shareholders and then a shareholder vote and closing in the third quarter of 2015" and that "*[t]here's no risk around the WPZ vote because Williams has majority of the votes, so the outcome of the WPZ vote is already known*." Defendant Chappel's statement gave WPZ investors the impression that Defendants were not aware of any impediments to an investor vote to approve the WPZ/WMB merger, but he omitted specific information known to Defendants that made such a vote uncertain and unlikely to occur.

**C.     ETE's pursuit of WMB prior to the announcement of the WPZ/WMB merger**

39.     WMB's management had known of ETE's interest in acquiring WMB since at least February 2014.  At that time, Kelcy L. Warren, the Chairman of the board of directors of LE GP, LLC (which is the general partner of ETE), contacted Defendant Armstrong and expressed interest in exploring a combination of ETE and WMB.   Defendant Armstrong assured Mr. Warren that he would present any offer made to the WMB Board.

40.     In November of 2014, Barclays Capital Inc. (which is one of WMB's financial advisors), received an informal indication of interest from Jamie Welch, the Group Chief Financial Officer and Head of Business Development of ETE's general partner, regarding a

potential transaction between WMB and ETE.  A representative of Barclays reported this conversation to WMB management.

41.     During a November 19, 2014 WMB Board meeting, a director requested a separate session to discuss ETE's interest in WMB.  Then, on November 24, 2014, the WMB Board discussed ETE's interest in WMB and concluded it would seek further guidance from Barclays and Cravath, Swaine & Moore LLP ("Cravath"), one of WMB's outside legal counsel, to further consider ETE's interest in WMB.  Shortly thereafter, representatives of Barclays informed representatives of ETE that the WMB Board had been made aware of ETE's interest and that it was being considered.

42.     On December 5, 2014, the WMB Board held a special meeting with members of WMB management and representatives of Barclays and Cravath.  During this meeting, the WMB Board discussed ETE's interest in WMB and various considerations in exploring a transaction with ETE, including the potential impact on the pending merger between ACMP and WPZ (the "ACMP-WPZ merger").  The WMB Board determined that in light of the pending ACMP-WPZ merger, it was not in the best interest of WMB stockholders to engage in discussions with ETE at that time.  However, the WMB Board did not terminate its consideration of a transaction with ETE.  Rather, the WMB Board requested that members of WMB management and representatives of Barclays prepare an overview of ETE and its affiliates for the December 18, 2014 WMB Board meeting and that they prepare a review of other strategic opportunities available to WMB for the January 2015 WMB Board meeting.

43.     On December 18, 2014, the WMB Board held a special meeting with members of WMB management and representatives of Barclays and Cravath.  During this meeting, representatives of Barclays provided an overview of ETE and its affiliates, including, among

other things, an overview of ETE's then existing five publicly traded companies, the nature of ETE's operations and sources of revenue, ETE's acquisition history, organic growth prospects, recent developments and equity price performance.  Representatives of Barclays advised the WMB Board that the overview would be further updated over the coming weeks, and the WMB Board requested that Barclays prepare certain additional materials for the January 2015 WMB Board meeting.

44.     On January 20, 2015, the WMB Board held a meeting with members of WMB management and representatives of Barclays and Cravath.  During this meeting, representatives of Barclays made a presentation regarding strategic alternatives available to WMB.  The WMB Board determined to restart WMB's conversations with ETE after the completion of the ACMP-WPZ merger by contacting ETE to obtain additional details about the nature and terms of ETE's interest in a potential combination with WMB.  The WMB Board instructed members of WMB management to formally retain Barclays to review and advise on strategic alternatives, including a potential sale of WMB.

45.     On February 13, 2015, after the completion of the ACMP-WPZ merger, Defendant Armstrong contacted Mr. Warren, the chair of ETE's general partner, to obtain additional details about the nature and terms of ETE's interest in WMB.  Defendant Armstrong informed Mr. Warren that he would convey any offer from ETE to the WMB Board.

46.     On February 20, 2015, following the closing of the ACMP-WPZ merger, Mr. Welch, the CFO of ETE's general partner, called a representative of Barclays to further discuss ETE's interest in WMB.  The representative of Barclays suggested to Mr. Welch that the best channel of communication to continue such discussion would be directly between Mr. Warren and Defendant Armstrong.

47.     On February 26, 2015, Mr. Warren attempted to call Defendant Armstrong, but was unable to reach him.  On March 2, 2015, Defendant Armstrong returned Mr. Warren's call and Mr. Warren invited Defendant Armstrong to meet to discuss ETE's interest in WMB. Defendant Armstrong agreed to discuss the invitation with the WMB Board.

48.     On March 4, 2015, Defendant Armstrong reported his conversation with Mr. Warren to the WMB Board.  The WMB Board determined it would be beneficial for Defendant Armstrong accept Mr. Warren's invitation and that WMB would consider any strategic proposal.

49.     On March 5, 2015, WMB Board again discussed the potential combination of WMB with ETE and received advice from Barclays concerning ETE.  During the same meeting, members of WMB management and representatives of Barclays presented a potential transaction in which WMB would acquire all of the public outstanding common units of WPZ.

50.     On March 13, 2015, Defendant Armstrong finally responded to Mr. Warren's invitation, that had been pending for over two weeks, to continue the acquisition discussions. Scheduling efforts over the ensuing weeks ultimately resulted with Defendant Armstrong and Defendant Chappel agreeing to attend a dinner on May 6, 2015 with Mr. Warren and Mr. Welch at Mr. Warren's home to discuss ETE's interest in WMB.   On May 6, 2015, Defendant Armstrong and Defendant Chappel attended that dinner and the attendees discussed a potential combination of WMB and ETE to support ETE's diversified strategy.  This discussion further informed Defendant Armstrong and Defendant Chappel that ETE would not be interested in acquiring the publicly-held WPZ common units because ETE's diversified strategy called for its various MLPs, gas as well as other non-gas energy infrastructures, to be separately traded.

51.     Thus, there was no indication that ETE's interest in acquiring WMB included also acquiring the publicly-held WPZ common units when acquiring WMB.  As discussed below,

when ETE publicly announced its offer to acquire WMB, it conditioned its offer on the termination of the WPZ/WMB merger agreement.

### D.     ETE responds to the WPZ/WMB merger agreement

52.     On May 12, 2015, the WMB Board held a special meeting with members of WMB management and WMB's legal and financial advisors.  During this meeting, the WMB Board discussed the proposed WPZ/WMB merger in which WMB would acquire all of the public outstanding common units of WPZ in an all stock-for-unit transaction at a ratio of 1.115 shares of WMB common stock per common unit of WPZ.  Without having taken any action to terminate, or otherwise resolve, WMBs ongoing talks with ETE, the WMB Board unanimously approved the WPZ/WMB merger agreement.

53.     Later in the day on May 12, 2015, a special meeting of the WPZ Board was telephonically convened. During this meeting, the WPZ Board unanimously approved the WPZ/WMB merger agreement.   WMB and WPZ then executed the WPZ/WMB merger agreement.

54.     The next day, May 13, 2015, as discussed above, WMB and WPZ issued a joint press release announcing the execution of the WPZ/WMB merger agreement and Defendants discussed the WPZ/WMB merger at the Analyst Day without disclosing ETE's interest in WMB, that WMB management had discussions with ETE concerning ETE's acquiring WMB, or that those discussions were ongoing.  Upon the news of the announcement and the analysts' digestion of WMB management's comments, WPZ common units, which had closed at $47.40 per unit the day before, closed at $58.16 per unit with an intraday high of $59.41 per unit.

55.     On May 19, 2015, less than a week after the announcement of the WPZ/WMB merger and less than two weeks after Defendant Armstrong and Defendant Chappel discussed a combination of WMB and ETE with Mr. Warren and Mr. Welch, Defendant Armstrong received

a written offer from Mr. Warren providing that ETE would acquire WMB in an all-equity transaction at an implied price of $64.00 per share of WMB common stock, which represented a 20% premium relative to the closing price of the shares of WMB common stock on May 19, 2015.  ETE's offer was conditioned on the termination of the WPZ merger agreement, and indicated that ETE would agree to a "hell or high water" regulatory standard (i.e., that ETE would commit to undertake any obligations are required to obtain federal antitrust or other regulatory approval) in the definitive merger agreement.  ETE later stated that "[a]fter the WPZ merger announcement, ETE believed it had no other choice but to provide the detailed terms of its interest to the [WMB] Board."

56.     The next day, Defendant Armstrong informed the WMB Board that he had received Mr. Warren's written offer.  The WMB Board discussed the letter and the process for reviewing it and decided to further discuss the letter the following day with the benefit of WMB's advisors.

57.     On May 21, 2015, the WMB Board held a meeting with members of WMB management and representatives of WMB's financial and legal advisors.  The WMB Board determined that Defendant Armstrong should inform Mr. Warren that ETE's proposal had been received and that the WMB Board would carefully consider it.

58.     Thereafter, the WMB Board worked with its financial and legal advisors to consider the ETE proposal.  During this process, on May 29, 2015, certain WMB directors acknowledged that WMB management failed to provide the WMB Board with complete and accurate information concerning ETE's determination to acquire WMB.  These directors did so by expressing their concerns that the WMB Board was not provided all material information in connection with the approval of the WPZ/WMB merger agreement.

14

59.     The WMB Board includes Defendant Armstrong and twelve outside directors, two of whom are activist investors who were appointed to the WMB Board in 2014 in exchange for their agreement to not solicit proxies while they are on the WMB Board and to vote their shares in favor of all of WMB management's director nominees.

60.     The raising of these concerns by the directors is an acknowledgement by these directors that, subsequent to approving the WPZ/WMB merger agreement, they received additional important information (i.e. the strength of ETE's interest in WMB and that such interest was contingent on WMB not acquiring WPZ's publicly-held common units) that they believed should have been made available to them prior to approving and announcing the WPZ/WMB merger agreement.  Not only was the WMB Board not given this information during the consideration of the WPZ/WMB merger agreement or prior to or upon its announcement, the information was also not available to investors in the marketplace.  This was a knowing violation of federal securities laws.

61.     Knowledge of ETE's intense interest in WMB would have been material not only to WPZ's unitholders, but also to the WMB Board.  When later deciding to approve the WMB/ETE merger agreement and terminate the WPZ/WMB merger agreement, the WMB Board accepted their advisors' advice that ETE's offer would receive strong support from WMB stockholders and that WMB stockholders would likely not approve the WPZ merger if ETE's offer was outstanding.

62.     On May 30, 2015, Frank MacInnis, Chairman of the WMB Board, Defendant Armstrong and WMB's legal advisors participated in a conference call during which they discussed the concerns raised by the directors that the WMB Board had not been given all material information in connection with its approval of the WPZ/WMB merger agreement.

63.     On June 1, 2015, the WMB Board held a special meeting with members of WMB management and representatives of WMB's legal advisors to discuss those same concerns.

64.     On June 10, 2015, Mr. MacInnis, WMB's chairman, received a letter from Mr. Warren, reiterating ETE's proposal to acquire WMB.   The letter stated that representatives of ETE expected to hear from representatives of WMB by the end of the week.

65.     On June 18, 2015, the WMB Board received another letter from ETE, in which ETE again reiterated its proposal to acquire all of the outstanding shares of WMB common stock, contingent on the termination of the WPZ merger agreement.   The letter indicated that it would be ETE's last attempt to engage in a non-public discussion regarding a mutually negotiated transaction, requested that WMB deliver a complete and substantive response by 9:00 a.m. ET on June 22, 2015 and noted that if WMB failed to do so, then ETE would publicize its proposal to WMB stockholders and would plan to take its proposal directly to WMB stockholders.

66.     On June 20, 2015, a special meeting of the WMB Board was convened with members of WMB management and representatives of WMB's legal and financial advisors. Under pressure from ETE, the WMB Board authorized management to publicly announce that it was commencing a process to explore a range of strategic alternatives and to communicate to ETE that its proposal did not provide an adequate basis on which to begin discussions regarding a potential transaction and that it significantly undervalued WMB.

67.     Although the WMB Board authorized management to announce that WMB was "commencing" the process to explore strategic alternatives, as discussed above, that process in fact started much earlier and was ongoing even as the WPZ/WMB deal was announced.   In December 2014 the WMB Board requested that members of WMB management and

16

representatives of Barclays prepare an overview of ETE and its affiliates and that they prepare a review of other strategic opportunities available to WMB.  And, in January 2015, the WMB Board instructed members of WMB management to formally retain Barclays to review and advise on strategic alternatives, including a potential sale of WMB.  And as stated above, there were discussions already taking place with ETE concerning an acquisition of WMB.  This background was not disclosed when Defendants announced the plans for a WPZ/WMB merger.

68.    On June 21, 2015, Defendant Armstrong sent Mr. Warren a letter that communicated the message authorized by the WMB Board.  Defendant Armstrong informed Mr. Warren that ETE's proposal to acquire WMB for an implied price of $64 per WMB share undervalued WMB.  Notably, WMB ultimately entered into a merger agreement with ETE at an implied price of $43.50 per WMB share.

69.    Later in the day on June 21, 2015, WMB issued a press release announcing that the WMB Board had authorized a process to explore a range of strategic alternatives following receipt of an unsolicited proposal to acquire WMB in an all-equity transaction at an implied price of $64.00 per share of WMB common stock.

70.    In response, in the early the morning of Monday June 22, 2015, ETE issued a press release that informed the public, including WPZ unitholders, that ETE "ha[d] made multiple attempts over an almost 6-month period to engage in meaningful, friendly dialogue with the senior management of [WMB] regarding a proposed merger [between ETE and WMB]." ETE stated that, as a result of the announcement of the proposed merger between WPZ and WMB, it "felt compelled to send its written [merger] offer to [WMB] in an effort to bring ETE's interest to the attention of the [WMB] Board and to outline what ETE believes is a more compelling transaction than the proposed merger between [WMB] and WPZ."  ETE stated that

"[a]fter the WPZ merger announcement, ETE believed it had no other choice but to provide the detailed terms of its interest to the [WMB] Board."  Further, ETE stated that its interest in WMB was contingent on WMB terminating its merger agreement with WPZ.  In a separate communication, ETE stated: "This type of sudden public communication [i.e., its press release] is unusual in a proposed transaction of this magnitude."

### E. The price of WPZ common units falls immediately on the revelation of ETE's months long pursuit of WMB

71.     WPZ investors, surprised by the ETE press release, reacted immediately to the revelation of ETE's interest in WMB and the likelihood that the WMB would terminate its merger agreement with WPZ.  The price for WPZ common units dramatically fell 7.6% on this material news, from a $53.14 per unit closing price on June 19, 2015 to a $49.10 per unit closing price on June 22, 2015.

72.     WPZ investors drove down the price of WPZ common units because it was evident that WMB shareholders would not approve the WPZ/WMB merger so long as ETE had an interest in acquiring WMB.  When later deciding to terminate the WPZ/WMB merger agreement, the WMB Board agreed that the ETE offer for WMB would prevent the WMB shareholders from approving the WPZ/WMB merger.

73.     As analyst Gordon Haskett Research Advisors noted in a June 22, 2015 report, the announcement of ETE's interest in WMB "looks to be a worst-case mess for anyone who may have shorted WMB and gone long WPZ after" the announcement of the WPZ/WMB merger, as Plaintiff Erber had done, having relied upon the statements of the Defendants highlighting the WPZ/ WMB deal.

74.     The WMB shareholders preference for the ETE offer over the proposed WMB/WPZ merger was also reflected in the immediate and substantial rise in the share price of

WMB stock on June 22, 2015, the day ETE's offer was made public, from $48.34 to $60.86 per share, even though WMB management claimed that the ETE offer undervalued WMB.

75.     Analysts also recognized that the ETE offer was a better option for the WMB shareholders.  For example, on June 22, 2015, *Reuters* published the following article:

> Energy Transfer Offer may be Williams' Best Option – Analysts
>
> HOUSTON, June 22 (Reuters) - Energy Transfer Equity's unsolicited $48 billion ETE Offer for Williams Companies Inc. through a corporate structure with tax advantages may be the U.S. pipeline company's best option as potential bids from rivals are complicated by possible antitrust issues and the deal's rich price, investors and analysts said on Monday.

76.     Similarly, Investopedia reported on June 24, 2015:

> Energy Transfer Equity has made an extremely generous buyout offer for Williams. In fact, stockholders should be slightly concerned that the company might overpay considering the valuation of several peers in the midstream space. It's hard to understand what Williams Cos. management sees when it says the offer undervalues its company. If Williams demands a higher premium for its shares, then Energy Transfer might want to consider walking away.

**F.     WMB terminated the WPZ/WMB merger agreement**

77.     On September 25, 2015, a special meeting of the WMB Board was convened with members of WMB management and WMB's legal and financial advisors.  During that meeting, the WMB Board authorized and instructed members of WMB management and WMB's legal and financial advisors to finalize the terms of transaction documents for the potential ETE transaction substantially consistent with the terms set forth in ETE's most recent proposal and authorized Mr. MacInnis to communicate the foregoing to Mr. Warren.  Defendant Armstrong opposed the WMB Board's decision to approve the ETE deal.

78.     Later in the day on September 25, 2015, WMB provided written notice to WPZ that the WMB Board intended to change its recommendation of the WPZ merger agreement.  On

September 27, 2015, the WPZ Board agreed to terminate the WPZ merger agreement in exchange for an increase in the termination fee payable thereunder from $410 million to $428 million through a waiver of Williams GP's IDRs.  Although the true impact of the termination fee on WMB was far less than the $428 million because WMB owned 60% of WPZ.

79.     On September 30, 2015, Defendant Armstrong expressed his disappointment over losing WMB's independence during a town hall meeting with WMB employees held to discuss the ETE deal.  After acknowledging that he had not "been the most pleasant to work with" during the negotiation of the ETE deal and thanking those that "supported [him] despite [his] attitude sometimes," Defendant Armstrong stated:

> "as much as we may want to throw a pity party for ourselves, it is not going to do any good, so I can tell you that.  As much as I'd love to just get out there and wallow in the pity with you, that's not my job as a leader, and it's not where we need to be.  We need to show what we're made of and step up and be positive and move through this."

and that:

> "I will just tell you, you know, believe me, anybody knows this is tough, it's me, and I'm not going to be able to hide that from any of you all that know me well, but I am very committed to getting my chin up and making the very best out of this."

80.     During a October 13, 2015 town hall meeting with WMB's employees, Mr. Warren, the Chairman of ETE's general partner, also acknowledged  Defendant Armstrong's disappointment over losing control of WMB, stating:

> "Alan and I are more similar than you might think. We both come from engineering backgrounds, we both have engineering operations in our background. And we're both very, very competitive people. If someone had tried to take my company over, I would have fought tooth and nail. I mean, just you wouldn't believe what I'd have done.  And if I had not prevailed, I don't know if I could conduct myself as — the way Alan Armstrong is."

## V.      LOSS CAUSATION

81.      During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of WPZ securities and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on June 22, 2015, the price of WPZ securities fell precipitously.  As a result of their purchases of WPZ securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## VI.     CLASS ACTION ALLEGATIONS

82.      Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired the publicly traded securities of WPZ during the Class Period ("the Class").  Excluded from the Class are Defendants and their officer, directors, and family members, as applicable.

83.      The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of February 13, 2015, there were 586,694,683 WPZ common units outstanding, owned by hundreds or thousands of investors.

84.      There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

     a.   Whether Defendants violated the Exchange Act;

     b.   Whether Defendants omitted and/or misrepresented material facts;

c.  Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d.  Whether Defendants are personally liable for the alleged misrepresentations and omissions described herein;

e.  Whether the price of WPZ securities was artificially inflated by such misrepresentations and omissions;

f.  Whether Defendants' conduct caused the members of the Class to sustain damages; and

g.  The extent of damage sustained by Class members and the appropriate measure of damages.

85.  Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

86.  Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

87.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## VII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

88.  Defendants' "Safe Harbor" warnings accompanying their forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

89.  Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the

statement was false or misleading and the statement was authorized and/or approved by an executive officer of the Entity Defendants who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

90.     Further, having chosen to disclose the terms of the WPZ/WMB agreement, tout the benefits of the merger to the WPZ unitholders, and boost investor confidence that the merger would be completed, Defendants had a duty to make a complete disclosure concerning WMBs consideration and evaluation of strategic alternatives, including its discussions with ETE, and to update, correct or withdraw their statements as information changed.  There in fact had been substantial changes which were not reflected in the May 23, 2015 announcement of the WPZ/WMB merger agreement, including that ETE made a firm offer to the WMB Board to acquire WMB that the offer was conditioned on the termination of the WPZ/WMB merger agreement and that WMB was actively evaluating ETE's the offer.

## VIII.   PRESUMPTION OF RELIANCE

91.     At all relevant times, the market for WPZ's common units was an efficient market for the following reasons, among others:

> h.   WPZ common units met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

> i.   As a regulated issuer, WPZ filed periodic public reports with the SEC;

23

j.   WPZ regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

k.   WPZ was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).   Each of these reports was publicly available and entered the public marketplace.

92.   As a result of the foregoing, the market for WPZ common units promptly digested current information regarding WPZ from all publicly available sources and reflected such information in the price of WPZ common units.   Under these circumstances, all purchasers of WPZ common units during the Class Period suffered similar injury through their purchase of WPZ common units at artificially inflated prices and the presumption of reliance applies.

93.   A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.   Because this action involves Defendants' failure to disclose material information regarding ETE's pursuit of WMB—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of ETE's pursuit of WMB, as set forth above, that requirement is satisfied here.

## IX.  ADDITIONAL ALLEGATIONS OF SCIENTER

94.  Defendants made the material omissions and misrepresentations complained of herein with scienter in that they knew and/or recklessly disregarded that the above-mentioned announcement of the WPZ/WMB merger agreement, and the statements made in connection with that announced merger, that were issued or disseminated by the Control Person Defendants or by the Entity Defendants, were materially false and misleading when made by omitting material information necessary to make their statements fully accurate and comprehendible.  The Defendants knew that their failure to reveal this material information would likely mislead investors, such as Plaintiff and the Class.

95.  The fraud alleged in this Complaint did not involve or arise from the actions of lower level employees, nor was it otherwise hidden from the Control Person Defendants.  To the contrary, WMB's discussions with ETE concerning ETE's dogged pursuit of WMB were conducted by Defendants Armstrong and Defendant Chappel, with the advance approval of WMB's Board.  In addition, Defendant Armstrong and Defendant Chappel are senior officers and, in the case of Defendant Armstrong, a director of both Williams Partners GP and WMB, which control WPZ.  Thus, the knowledge possessed by Defendant Armstrong and Defendant Chappel can be attributed to both Williams Partners GP and WMB, and consequently to WPZ.

96.  Prior to WMB's Board approving the WPZ/WMB merger, Defendant Armstrong had no fewer than four conversations with senior representatives of ETE concerning a potential transactions between WMB and ETE.  One of these conversations was during a dinner meeting with Defendant Chappel and senior ETE representatives that was held less than a week prior to the approval of the WPZ/WMB merger.

97.  Defendant Armstrong was also present at numerous WMB Board meetings where ETE's interest in WMB was discussed by the WMB Board and WMB's advisors.  These WMB

Board meetings also included presentations, made by WMB management (presumably including Defendant Chappel) and WMB's advisors at the request of the WMB Board, concerning ETE's interest in WMB.

98.     These facts, as well as others stated above, establish the strong inference that the Control Person Defendants acted with scienter and, consequently, that the Entity Defendants they controlled did so as well.

### COUNT I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against All Defendants)

99.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

100.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase WPZ common units at artificially inflated prices.

101.     Throughout the Class Period, the Defendants individually, and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce, the mails and the facilities of a national securities exchange, employed devices, schemes and artifices to defraud, made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, and engaged in acts, practices and a course of business which operated as a fraud and deceit upon Class members, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

102.     The Defendants' false and misleading statements and omissions were made with scienter and were intended to and did, as alleged herein, (i) deceive the investing public,

including Plaintiff and the other members of the Class; (ii) artificially create, inflate and maintain the market for and market price of the WPZ common units; and (iii) cause Plaintiff and the other members of the Class to purchase WPZ common units at inflated prices.

103.     By failing to inform the market of ETE's months-long pursuit of WMB, its intent to make an attractive offer to acquire WMB, and its lack of interest in acquiring the publicly-held WPZ common units, and making other false statements and material omissions, the Defendants presented a misleading picture of WPZ's finances and prospects.  This caused and maintained artificial inflation in the trading prices of WPZ's publicly traded common units throughout the Class Period and until the truth came out.

104.     The Defendants were individually and collectively responsible for making the statements and omissions alleged herein by virtue of having prepared, approved, signed and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading and/or making direct statements to the investing public as detailed herein.

105.     During the Class Period, Defendant Armstrong and Defendant Chappel, as senior executive officers of the Entity Defendants, had access to material adverse non-public information concerning WPZ, its operations, finances, financial condition, and present and future business prospects.  Because of their positions with the Entity Defendants, Defendant Armstrong and Defendant Chappel were privy to confidential and proprietary information, and information about WPZ's business, finances, and present and future business prospects via internal corporate documents and conversations and via communications with high-level representatives of ETE.  Because of their possession of such information, Defendant Armstrong and Defendant Chappel

knew or recklessly disregarded that the adverse facts specified therein had not been disclosed to, and were being concealed from, the investing public.

106.    As senior executive officers and/or directors and as controlling persons of the Entity Defendants and WPZ, a publicly traded master limited partnership whose common units were, and are, registered with the SEC pursuant to the Exchange Act, and were, and are, traded on the NYSE and governed by the federal securities laws, the Defendant Armstrong and Defendant Chappel had a duty to promptly disseminate accurate and truthful information with respect to WPZ's present and future financial condition and business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of WPZ's common units would be based upon truthful and accurate information. The Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

107.    The Defendants are liable as direct participants in the wrongs complained of herein. As described herein, the Defendants made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiff and other members of the Class who purchased WPZ common units during the Class Period.   There is a substantial likelihood that the disclosure of these omitted facts would have been viewed by the reasonable investor as having significantly altered the total mix of information available about the prospects of the WPZ.

108.    The Defendants' false statements and omissions were made in connection with the purchase or sale of WPZ's common units.

109.    In ignorance of the untrue and misleading nature of the Defendants' statements and/or upon the integrity of the market price for WPZ common units, Plaintiff and the other

members of the Class purchased WPZ common units at artificially inflated prices during the Class Period.  But for the fraud, they would not have purchased the WPZ common units at artificially inflated prices.

110.    The market price for WPZ common units declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by the Defendants, as described above.

111.    Plaintiff and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of WPZ common units at artificially inflated prices and the subsequent decline in the price of those common units when the truth was disclosed.

112.    This claim is brought within two years after discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

113.    By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, and are liable to Plaintiff and the members of the Class, each of whom has been damaged as a result of such violation.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### (Against Defendants Armstrong, Chappel, WMB and Williams Partners GP (the "Control Person Defendants"))

114.    Plaintiff repeats and realleges each and every allegation set forth above as if set forth fully herein.

115.    As alleged herein, the Defendants are liable to Plaintiff and the Class who purchased WPZ securities based on the materially false and misleading statements and omissions set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

116.    Throughout the Class Period, the Defendants Armstrong and Chappel were controlling persons of Defendant WMB and Defendants Armstrong, Chappel, WMB and Williams Partners GP were controlling persons of Defendant WPZ within the meaning of Section 20( a) of the Exchange Act, and culpable participants in the fraud detailed herein.

117.    The Control Person Defendants, by reason of their status as senior executive officers, directors, general partner, and/or controlling shareholder, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Entity Defendants to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Control Person Defendants were able to and did, directly or indirectly, control the conduct of the Entity Defendants' businesses.  Defendant Armstrong and Defendant Chappel exercised control over the Entity Defendants during the Class Period by virtue of, among other things, their executive positions with the Entity Defendants, the key roles they played in the Entity Defendants' management, and their direct involvement in their day-to-day operations.  Defendant Williams Partners GP exercised control over WPZ by virtue of its position as general partner of WPZ and its right to manage WPZ's operations and activities.  Defendant WMB exercised control over WPZ by virtue of its position 100% owner of Williams Partners GP and its ownership of 60% of WPZ's common units.

118.    The Control Person Defendants, because of their positions with the Entity Defendants, controlled and/or possessed the authority to control the contents of reports, press releases and presentations to securities analysts and, through them, to the investing public.  The Control Person Defendants were provided with copies of the reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and

opportunity to prevent their issuance or cause them to be corrected.  Thus, the Control Person Defendants had the opportunity to commit the fraudulent acts alleged herein.

119.    Given their individual and collective responsibilities for managing the Entity Defendants (and Williams Partners GP) throughout the Class Period, Defendant Armstrong and Defendant Chappel were regularly presented to the market as the individuals who were responsible for the Entity Defendants' day-to-day business and operations, as well as the Entity Defendants' strategic directions.   Defendant Armstrong and Defendant Chappel accepted responsibility for assuring the market about the state of, and prospects for WPZ.

120.    As a result of the false and misleading statements and omissions alleged herein, the market price of WPZ securities was artificially inflated during the Class Period.

121.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for WPZ common units.  Plaintiff and the Class would not have purchased the WPZ common units at the prices they paid, or at all, had they been aware that the market prices for WPZ common units had been artificially inflated by Defendants' fraudulent course of conduct.

122.    As a direct and proximate result of the Control Person Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the WPZ common units during the Class Period.

123.    By virtue of the foregoing, the Control Person Defendants violated Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a.  Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.  Awarding compensatory damages in favor of Plaintiff and other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.  Awarding Plaintiff and the Class their reasonable Costs and expenses incurred in this action, including attorneys' fees and expert fees;

d.  Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 7, 2016

/s/ William B. Federman
William B. Federman (Bar No. 2853)
James P. Woodruff (Bar No. 11579)
**Federman & Sherwood**
10205 North Pennsylvania Avenue
Oklahoma City, Oklahoma 73120
Telephone:  (405) 235-1560
Facsimile:  (405) 239-2112
Email:  WBF@federmanlaw.com
        JPW@federmanlaw.com

Robin Switzenbaum
Lawrence Deutsch
Jeffrey L. Osterwise
**Berger & Montague, P.C**.
1622 Locust Street
Philadelphia, PA  19103
Telephone:  (215) 875-3000
Facsimile:   (215) 875-4613
Email:  rswitzenbaum@bm.net
          ldeutsch@bm.net
          josterwise@bm.net

*Attorneys for Plaintiff*

## WILLIAMS PARTNERS, L.P.
## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

Michael Erber ("Plaintiff"), hereby duly swears and says, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the draft complaint against Williams Partners, L.P., The Williams Companies, Inc., Williams Partners GP LLC, Alan S. Armstrong, and Donald R. Chappel, approves of its contents, and authorizes his selected counsel, Berger & Montague, P.C., to file a lead plaintiff petition on his behalf.

2.      Plaintiff did not purchase the security that is the subject of the complaint at the direction of his counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transactions in the security that is the subject of the complaint during the class period alleged in the complaint are as follows:

**Transactions in Williams Partners, L.P. common units during the period May 13, 2015 through June 19, 2015:**

| Number of Shares or Amount of Securities Purchased | Date of Purchase | Price Per Share |
|---|---|---|
| 400 | 06/16/2015 | $52.96 |
| 500 | 06/17/2015 | $53.1476 |

5.      Plaintiff has not sought to serve or served as a representative party on behalf of a class under the United States federal securities laws during the three (3) years preceding the date on which this certification is signed.

6.      Plaintiff has not accepted and will not accept any payment for serving as representative party on behalf of the class beyond his *pro rata* share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 25 day of February, 2016.

By: _____
Michael Erber