**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| 1) MICHAEL ERBER,<br><br>Plaintiff,<br><br>- against –<br><br>1) THE WILLIAMS COMPANIES, INC.,<br>2) WILLIAMS PARTNERS L.P.,<br>3) WILLIAMS PARTNERS GP LLC,<br>4) ALAN S. ARMSTRONG, and<br>5) DONALD R. CHAPPEL,<br><br>Defendants. | Case No. 16-CV-0131-JHP-FHM<br><br>**JURY TRIAL DEMANDED** |

**AMENDED CLASS ACTION COMPLAINT**

**LABATON SUCHAROW LLP**
Joel S. Bernstein
*jbernstein@labaton.com*
Michael W. Stocker
*mstocker@labaton.*com
Ira A. Schochet
*ischochet@labaton.*com
Barry Michael Okun
*bokun@labaton.com*
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
*Attorneys for Lead Plaintiff Employees' Retirement System of the State of Rhode Island and Lead Counsel to Class*

**FEDERMAN & SHERWOOD**
William B. Federman
*WBF@federmanlaw.com*
10205 North Pennsylvania Avenue
Oklahoma City, Oklahoma 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
*Local Counsel to Class*

**TABLE OF CONTENTS**


I. INTRODUCTION ..... 1

II. PARTIES ..... 5

III. JURISDICTION AND VENUE ..... 6

IV. FACTUAL BACKGROUND ..... 7

A. WPZ and WMB ..... 7

B. Announcement of the WPZ/WMB merger agreement ..... 9

C. ETE's pursuit of WMB prior to the announcement of the WPZ/WMB merger ..... 10

D. Defendants understood, and the market would have understood, that the ETE acquisition would necessitate the cancellation of the WPZ/WMB merger ..... 15

E. ETE responds to the WPZ/WMB merger agreement ..... 18

F. The truth emerges about ETE's pursuit of WMB ..... 20

G. The price of WPZ common units falls immediately on the revelation of ETE's months-long pursuit of WMB ..... 22

H. WMB terminates the WPZ/WMB merger agreement ..... 24

V. MATERIALLY MISLEADING STATEMENTS AND OMISSIONS ..... 25

VI. MATERIALITY ..... 27

VII. LOSS CAUSATION ..... 27

VIII. CLASS ACTION ALLEGATIONS ..... 28

IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR ..... 30

X. PRESUMPTION OF RELIANCE ..... 31

XI. ADDITIONAL ALLEGATIONS OF SCIENTER ..... 32

COUNT I|
Violations of Section 10(b) of the Exchange Act and Rule 10b-5 (Against All Defendants) ..... 34

COUNT II
Violations of Section 20(a) of the Exchange Act (Against Defendants Armstrong, Chappel, WMB and Williams Partners GP (the "Control Person Defendants")) .......... 37

PRAYER FOR RELIEF .......... 39

JURY DEMAND .......... 40

Employees' Retirement System of the State of Rhode Island ("Lead Plaintiff") alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon counsel's investigation, which includes review and analysis of: (a) regulatory filings with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports; (c) securities analyst reports; (e) other public information; and (f) analysis of the foregoing by a consulting expert.

## I. INTRODUCTION

1. Lead Plaintiff and the other members of the Class of purchasers of Defendant Williams Partners L.P. ("WPZ") common units during the period May 13, 2015 through June 19, 2015, inclusive (the "Class Period"), were duped into purchasing their WPZ common units at artificially inflated prices by the material misrepresentations made by WPZ, The Williams Companies, Inc. ("WMB"), Williams Partners GP LLC ("Williams Partners GP"), Alan S. Armstrong ("Armstrong"), and Donald R. Chappel ("Chappel"). WPZ, WMB, Williams Partners GP, Armstrong, and Chappel are collectively referred to herein as "Defendants." When the revelation of these misrepresentations caused WPZ share prices to plunge, class members suffered millions of dollars in damages.

2. WPZ is an operating company in the energy infrastructure business formed as a master limited partnership. WMB not only owns 60% of the publicly traded WPZ limited partnership common units, but also controls WPZ through WPZ's general partner, Williams Partners GP. Specifically, WMB owns 100% of the shares of Williams Partners GP, all of WMB's senior officers are also senior officers of Williams Partners GP, and six of WMB's senior officers (including Defendant Armstrong and Defendant Chappel) are directors of Williams Partners GP. As a limited partnership, WPZ does not have directors or officers.

Instead, Williams Partners GP manages WPZ's operations and activities. At all relevant times, Williams Partners GP spoke on behalf of WPZ. Defendants Armstrong and Chappel spoke on behalf of both WMB and Williams Partners GP (and thus on behalf of WPZ).

3. On the morning of May 13, 2015, WMB and WPZ issued a joint press release announcing the execution of an agreement under which WMB would acquire all publicly held WPZ common units in an all stock-for-unit transaction at a 1.115 ratio of WMB common share per WPZ common unit (the "WPZ/WMB merger"). The announcement contained an assurance by Defendant Chappel – the CFO of both WPZ's general partner and WMB – that the merger was on track, and that there was "no risk" regarding the WPZ vote to consummate the transaction. Defendants Armstrong and Chappel repeatedly referred to the WPZ/WMB merger in the past tense, as a "done" deal that had already been "completed," whose benefits "will" be realized by WPZ investors.

4. Unbeknownst to investors, at the time the press release was issued, WMB was deeply engaged in considering alternate strategic transactions that could prevent WMB from completing the WPZ/WMB merger. WMB management, led by Defendant Armstrong and including Defendant Chappel, had been and were still in months-long discussions with Energy Transfer Equity L.P. ("ETE"), that were sanctioned by the WMB Board of Directors (the "WMB Board"), concerning ETE's proposal to acquire WMB.

5. This proposal had been discussed multiple times by the WMB Board, in consultation with professional advisors, including a major investment bank and a major law firm, and at no time prior to the announcement of the WPZ/WMB merger agreement had WMB or its board of directors ever rejected the proposal or communicated such a rejection to ETE.

6. Defendants knew the possibility of acceptance of ETE's acquisition proposal presented a material risk to the WPZ/WMB merger because the WPZ/WMB merger was contrary to the ETE's well-known business structure, common throughout the energy infrastructure industry, pursuant to which operating assets were held by limited partnerships (like WPZ) separate from ETE rather than by ETE itself.

7. The existence of this concealed negotiation would have been highly material to WMB investors, who had been assured by Defendants that there was no risk to the execution of the transaction.

8. Because they saw no reason to believe that the deal would not be completed, investors were energized by the proposed WPZ/WMB merger. The price of WPZ common units immediately rose 22.7% on the day that the deal was announced.

9. ETE, on the other hand, was shocked by the joint press release regarding the deal, and reacted swiftly. On May 19, 2015, less than a week later, Defendant Armstrong received a written offer from ETE to acquire WMB at an implied price of $64.00 per WMB common share. ETE's offer was conditioned on WMB terminating the WPZ/WMB merger agreement. Defendant Armstrong presented that offer to the WMB Board the next day.

10. Frustrated with the market's ignorance of its offer, ETE, prior to the opening of trading on June 22, 2015, publicly announced its proposal, the requirement that WMB terminate the WPZ/WMB merger agreement, and details concerning its months-long pursuit of WMB. ETE stated that, after the announcement of the WPZ/WMB merger, it "believed that it had no other choice but to provide the detailed terms of its interest" in WMB to the WMB Board. In fact, as noted above and explained in detail below, completion of the WPZ/WMB merger would

present an economic hurdle to ETE's acquisition of WMB. ETE stated that it was disappointed that it was forced into a position where it had to publicly confirm its offer for WMB.

11. The public revelation of ETE's pursuit to acquire WMB surprised WPZ unitholders who had believed that nothing could impede the acquisition, causing an immediate sell-off. As a result of this material news, the price of WPZ units fell 7.6% on the day of the announcement.

12. On the opposite side, securities analysts and WMB investors immediately recognized the strength of ETE's offer for WMB. The price of WMB common shares jumped almost 26% the day ETE's offer was announced.

13. The market's reaction to the announcement of ETE's offer to acquire WMB was a result of its learning of the precise risk that Defendants had previously concealed from WPZ investors: an alternative transaction that was more attractive to WMB shareholders and preclusive of the WPZ/WMB merger, one that would likely result in the scuttling of that latter transaction, notwithstanding Defendants' assurances of no consummation risk. And, in fact, that is what happened, as the WMB Board eventually terminated the WPZ/WMB merger agreement ----in advance of, and thereby obviating any vote on that transaction by securities holders of either WPZ or WMB----in favor of a negotiated acquisition of WMB by ETE.

14. Defendants were aware or recklessly disregarded that knowledge of ETE's ongoing pursuit of WMB would have been material to Lead Plaintiff and the Class when they purchased their WPZ common units and that Lead Plaintiff and the Class would be misled without that information. Had Defendants made complete and accurate disclosures of all material information when they announced the WPZ/WMB merger agreement, WPZ investors would have appreciated that ETE's interest in WMB materially reduced the probability that the

WPZ/WMB merger would be completed. WPZ investors would not have acquired WPZ common units or would have substantially discounted the price of WPZ common units to account for that information.

15. Instead, owing to Defendants' false, misleading, and incomplete statements that led investors to believe that there was no material risk that the deal would not be completed, the price for WPZ common units was artificially inflated. When this deception was revealed, all Class members suffered damages. Lead Plaintiff brings this action to recover for itself and on behalf of the Class the substantial damages that resulted from Defendants' wrongful conduct.

## II. PARTIES

16. Lead Plaintiff purchased WPZ common units on the New York Stock Exchange ("NYSE") during the Class Period at prices ranging from $56.03 to $58.04. It suffered damages as a result of the violations of the federal securities laws alleged herein.

17. Defendant The Williams Companies, Inc. (defined above as "WMB") is a corporation incorporated under the laws of the State of Delaware with its principal executive offices located in Tulsa, Oklahoma.

18. Defendant Williams Partners L.P. (defined above as "WPZ") is a master limited partnership ("MLP") incorporated under the laws of the State of Delaware with its principal executive offices located in Tulsa, Oklahoma.

19. Defendant Williams Partners GP LLC (defined above as "Williams Partners GP") is a limited liability company organized under the laws of the State of Delaware with its principal executive offices located in Tulsa, Oklahoma. Defendant Williams Partners GP is the general partner of WPZ.

20. WPZ, WMB, and Williams Partners GP are collectively referred to herein as the "Entity Defendants".

21. Defendant Alan S. Armstrong (defined above as "Armstrong") serves as Chairman of the Board and Chief Executive Officer of Defendant Williams Partners GP, the general partner of Defendant WPZ. Armstrong has also been employed by Defendant WMB for almost thirty years and has served as President, Chief Executive Officer, and as a director of WMB since January 2011.

22. Defendant Donald R. Chappel (defined above as "Chappel") serves as Chief Financial Officer and director of Defendant Williams Partners GP, the general Partner of WPZ. He has also served as Senior Vice President and Chief Financial Officer of WMB since April 2003.

23. Armstrong, Chappel, WMB, and Williams Partners GP are collectively referred to herein at the "Control Person Defendants".

**III. JURISDICTION AND VENUE**

24. The claims on behalf of the Class (defined below) arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) ("Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5. This Court has jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa; and 28 U.S.C. §§ 1331 and 1337.

25. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c) and (d). WPZ, WMB and Williams Partners GP maintain their corporate offices in this District and many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.

26. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

the United States mails, interstate telephone communication, and the facilities of a national securities market.

## IV. FACTUAL BACKGROUND

### A. WPZ and WMB

27. WPZ is a large-cap Master Limited Partnership providing infrastructure for United States natural gas and natural gas products, including providing "midstream" gathering and treating services for producers of natural gas and "pipeline" services connecting the sources of natural gas with the markets for such gas, primarily via pipelines. Williams Partners GP is the general partner of WPZ.

28. WMB is one of the largest energy infrastructure companies in North America. While WMB conducts some of its own operations, similar to those conducted by WPZ, in Canada, it primarily serves as a parent entity indirectly operating, and receiving revenues from, operating MLPs such as, and primarily including, WPZ. WMB owns 100% of WPZ's general partner, Williams Partners GP, and approximately 60% of the WPZ common units. Also, through its ownership of Williams Partners GP, WMB has incentive distribution rights ("IDRs") in WPZ. IDRs are rights to an increasing share in the incremental distributable cash flow a partnership generates. Thus, WMB not only receives regular distributions from its WPZ common units, but also it is entitled to an increased proportion of WPZ's quarterly distributions.

29. The business structure that had been utilized by WMB, where a parent entity indirectly conducts operations through MLPs, and receives revenue from the MLPs primarily in the form of IDRs – and in which the investing public could purchase interests in either or both of the parent entity and the MLPs – is and has been standard in the energy infrastructure industry. Under the MLP model, a sponsor sets up a structure by which it wholly owns a General Partner ("GP"), one that is compensated for its management efforts through IDRs, thereby giving it a

larger share of the MLP's distributions than its equity interest would warrant. IDRs incentivize GPs to increase the MLP's distributions to its common unit holders. As the GP raises the nominal amount of distributions made by the MLP to predetermined thresholds, the GP receives an increasing percentage of the distribution. The IDR schedule occurs in a staggered manner and as the distribution target at each stage is reached, the cash flow available to the GP increases up to 50%. As a result of this common structure, the GP (and hence its owner, the sponsor) receives increasing rewards from, and therefore benefits by, increasing distributions. In this case, if the MLP model were adhered to, ETE did not need to spend an additional $13.8 billion to acquire the remaining shares of WPZ to receive the benefits of being the 100% owner of WPZ's GP.

30. MLPs are limited partnerships that are publicly-traded on an exchange. There are two types of owners of an MLP, the GP and the LP unit holders. The GP manages the day-to-day operations of the MLP. An MLP is a tax-advantageous structure which pays no tax at the company level. The cash flow of the MLP is distributed, almost entirely, to the unitholders who are then responsible for taxes. A share in an MLP is called a "unit," and investors who own MLP units are considered limited partners. To qualify for MLP status, a partnership must generate at least 90 percent of its income from what the Internal Revenue Service considers "qualifying" sources, such as those activities related to the production, processing, and transportation of oil, natural gas, and coal. Most of the MLP market today consists of energy-related businesses. An advantage of this model is that it limits the exposure of the parent entity (and its investors) to downside movements of the MLPs (while giving them full benefit of the MLPs' upsides).

31. Starting in or about August 2014, however – when Kinder Morgan surprised the industry by absorbing its MLPs and consolidating its asset holdings into a single operating entity

– some energy infrastructure companies have adopted that new consolidated model. In that model, there are no sponsors (such as WMB), GPs (such as Williams Partners GP), and MLPs (such as WPZ), but only single consolidated operating entities. As of the time of the announced WPZ/WMB merger agreement, no other energy infrastructure company had adopted that model.

**B. Announcement of the WPZ/WMB merger agreement**

32. On the morning of May 13, 2015, WMB and WPZ issued a joint press release announcing the execution of an agreement under which WMB would acquire all publicly-held WPZ common units in an all stock-for-unit transaction at a 1.115 ratio of WMB common share per WPZ common unit. This announcement signaled WMB's adoption of the new business structure for energy infrastructure companies, where the parent entities absorb their operating MLPs and reconstitute themselves as operating entities.

33. Later on May 13, 2015, WMB and WPZ held a joint "Analyst Day" conference during which representatives of the companies discussed the proposed merger with securities analysts. Defendants emphasized the benefit of the WPZ/WMB merger to WPZ common unitholders. Defendant Armstrong stated that "we couldn't be more excited about . . . the transaction ***we just got done*** [*i.e.*, the proposed merger]."[1] He also touted the benefits to WPZ unit holders, stating: "We paid a premium to buy in the WPZ units, or will pay a premium when we close. The WPZ unitholders ***will*** enjoy the benefits of that premium. They'll enjoy the benefits of the dividend increase that we announced today. We expect they'll enjoy the uplift in Williams stock**,** so will enjoy all those things."

34. Similarly, Defendant Chappel highlighted that the proposed merger would create value for WPZ investors, including by lowering WPZ's cost of capital, which had increased due

---

[1] All bolded material in quotations are emphases that have been added.

to the burden imposed by WMB's IDRs in WPZ. He also explained that WPZ's investors would enjoy "much greater liquidity."

35. Defendant Chappel was asked directly whether "anything transpire[d] recently that changed [his] mind that now is the time to" collapse WPZ into WMB, which provided Defendants a clear opportunity to acknowledge that WMB had been considering other strategic alternatives and had been in discussions with a third party interested in acquiring WMB. However, neither Defendant Chappel nor Defendant Armstrong made those disclosures.

36. Instead, Defendant Chappel boosted investor confidence that the proposed WPZ/WMB merger would be completed by stating that "[w]e'd have a mailing to [WMB] shareholders and then a shareholder vote and closing in the third quarter of 2015" and that "[t]here's ***no risk*** around the WPZ vote because Williams has a majority of the votes, so the outcome of the WPZ vote is already known."

37. In response to the announcement of the proposed merger, the price for WPZ units jumped dramatically from a $47.40 per unit closing price on May 12, 2015 to a $58.16 per unit closing price on May 13, 2015, a 22.7% single-day increase.

38. WPZ investor enthusiasm was, however, misplaced because Defendants did not disclose that ETE had been in a months-long pursuit of WMB that posed a material risk to the WPZ/WMB transaction being consummated.

### C. ETE's pursuit of WMB prior to the announcement of the WPZ/WMB merger

39. By the time of the announcement of the planned WPZ/WMB merger, WMB and WPZ had long known of ETE's interest in acquiring WMB. Indeed, WMB's consideration of the ETE proposal was well advanced, in that its proposal had been discussed at no fewer than seven WMB Board meetings and had also been the subject of consultations by WMB with an

investment bank and outside legal counsel. The ETE acquisition would be an event of high magnitude for WPZ's investors, as it would endanger the consummation of the WPZ/WMB merger that WPZ's investors valued so highly. By the time of the announcement of the WPZ/WMB merger, the ETE acquisition had a material likelihood of completion, as it had been the subject of extensive WMB Board discussion and consultation with professional advisors, and ETE's months-long efforts at wooing WMB's management reflected a likely intent to make an attractive offer. This prospect represented an undisclosed material threat to the deal announced by WMB and WPZ.

40. Like WMB and WPZ, ETE is a major provider of "midstream" natural gas services. ETE, however, continues to adhere to the traditional structure of energy infrastructure companies, operating through MLPs and with ETE itself remaining a parent entity, rather than conducting operations directly as WMB planned to do after the contemplated WPZ/WMB merger.

41. WMB's management had known of ETE's interest in acquiring WMB since at least February 2014. At that time, Kelcy L. Warren, the Chairman of the board of directors of LE GP, LLC (the general partner of ETE), contacted Defendant Armstrong and expressed interest in exploring a combination of ETE and WMB. Defendant Armstrong assured Mr. Warren that he would present any offer made to the WMB Board.

42. In November of 2014, Barclays Capital Inc. (a WMB financial advisor)received an informal indication of interest from Jamie Welch, the Group Chief Financial Officer and Head of Business Development of ETE's general partner, regarding a potential transaction between WMB and ETE. A representative of Barclays reported this conversation to WMB management.

43. During a November 19, 2014 WMB Board meeting, a director requested a separate session to discuss ETE's interest in WMB. Then, on November 24, 2014, the WMB Board discussed ETE's interest in WMB and concluded it would seek further guidance from professional advisors, *i.e.*, Barclays and outside legal counsel Cravath, Swaine & Moore LLP ("Cravath"), to further consider ETE's interest in WMB. Shortly thereafter, representatives of Barclays informed representatives of ETE that the WMB Board had been made aware of ETE's interest and that it was being considered.

44. On December 5, 2014, the WMB Board held a special meeting with members of WMB management and representatives of Barclays and Cravath. During this meeting, the WMB Board discussed ETE's interest in WMB and various considerations in exploring a transaction with ETE, including the potential impact on the then-pending merger between WPZ and Access Midstream Partners, another natural gas "midstream" services provider (the "ACMP-WPZ merger"), which closed on February 2, 2015. The WMB Board determined that in light of the pending ACMP-WPZ merger, it was not in the best interest of WMB stockholders to engage in discussions with ETE at that time. However, the WMB Board did not terminate its consideration of a transaction with ETE. Rather, the WMB Board requested that members of WMB management and representatives of Barclays prepare an overview of ETE and its affiliates for the December 18, 2014 WMB Board meeting and that they prepare a review of other strategic opportunities available to WMB for the January 2015 WMB Board meeting.

45. On December 18, 2014, the WMB Board held a special meeting with members of WMB management and representatives of Barclays and Cravath. During this meeting, representatives of Barclays provided an overview of ETE and its affiliates, including, among other things, an overview of ETE's then existing five publicly traded companies, the nature of

ETE's operations and sources of revenue, ETE's acquisition history, organic growth prospects, recent developments and equity price performance. Representatives of Barclays advised the WMB Board that the overview would be further updated over the coming weeks, and the WMB Board requested that Barclays prepare certain additional materials for the January 2015 WMB Board meeting.

46. On January 20, 2015, the WMB Board held a meeting with members of WMB management and representatives of Barclays and Cravath. During this meeting, representatives of Barclays made a presentation regarding strategic alternatives available to WMB. The WMB Board determined to continue WMB's conversations with ETE after the completion of the ACMP-WPZ merger by contacting ETE to obtain additional details about the nature and terms of ETE's interest in a potential combination with WMB. The WMB Board instructed members of WMB management to formally retain Barclays to review and advise on strategic alternatives, including a potential sale of WMB. WMB formally retained Barclays for that purpose on February 3, 2015.

47. On February 13, 2015, after the completion of the ACMP-WPZ merger, Defendant Armstrong contacted Mr. Warren, the chair of ETE's general partner, to obtain additional details about the nature and terms of ETE's interest in WMB. Defendant Armstrong informed Mr. Warren that he would convey any offer from ETE to the WMB Board.

48. On February 20, 2015, following the closing of the ACMP-WPZ merger, Mr. Welch, the CFO of ETE's general partner, called a representative of Barclays to further discuss ETE's interest in WMB. The representative of Barclays suggested to Mr. Welch that the best channel of communication to continue such discussion would be directly between Mr. Warren and Defendant Armstrong.

49. On February 26, 2015, Mr. Warren attempted to call Defendant Armstrong, but was unable to reach him. On March 2, 2015, Defendant Armstrong returned Mr. Warren's call and Mr. Warren invited Defendant Armstrong to meet to discuss ETE's interest in WMB. Defendant Armstrong agreed to discuss the invitation with the WMB Board.

50. On March 4, 2015, Defendant Armstrong reported his conversation with Mr. Warren to the WMB Board. The WMB Board determined it would be beneficial for Defendant Armstrong to accept Mr. Warren's invitation and that WMB would consider any strategic proposal.

51. On March 5, 2015, the WMB Board again discussed the potential combination of WMB with ETE and received advice from Barclays concerning ETE. During the same meeting, members of WMB management and representatives of Barclays presented a potential transaction in which WMB would acquire all of the public outstanding common units of WPZ.

52. On March 13, 2015, Defendant Armstrong responded to Mr. Warren's invitation to continue the acquisition discussions. Scheduling efforts over the ensuing weeks ultimately resulted in Defendants Armstrong and Chappel agreeing to attend a dinner with Mr. Warren and Mr. Welch at Mr. Warren's home on May 6, 2015, to discuss ETE's interest in WMB. On May 6, 2015, Defendants Armstrong and Chappel attended that dinner, one that ended with the proposal of ETE's acquisition of WMB still open. As of that date, the Board had not instructed management to cease the longstanding discussions with ETE as to a possible merger acquisition of WMB or the Company's well-developed consideration of such a transaction, and WMB had not communicated to ETE that WMB had any flagging interest in such discussions.

**D. Defendants understood, and the market would have understood, that the ETE acquisition would necessitate the cancellation of the WPZ/WMB merger**

53. Defendants, as well as WMB's financial and legal advisors, knew, or recklessly disregarded, that ETE would not want the WPZ/WMB merger to proceed if ETE was to acquire WMB. Based on the same understanding, had analysts and other market participants known that WMB was considering an offer from ETE, there would had been a swift, negative market reaction to the news as it affected WPZ and the prospects of the WPZ/WMB merger. Informed readers of ETE's financial statements – which disclosed a continuous utilization of the MLP structure – understood that ETE would have wanted to keep WPZ as a separate public entity, just as it had done with its other standalone MLP assets, such as Energy Transfer Partners, L.P. and Sunoco Logistics Partners L.P. It was ETE's preferred business structure to hold separately traded MLPs while enjoying the IDR benefits. This structure is not unique to ETE, but is a common and general phenomenon in the energy infrastructure industry. While WMB was one of the first companies in the industry to evidence an intention to switch to the new consolidated model that had been introduced the year before the announcement of the WPZ/WMB merger, industry analysts and informed investors understood that ETE was committed to maintaining the MLP structure.

54. Historically, ETE never strayed from its initial business strategy of holding its operating assets in MLPs rather than directly. Indeed, shortly before the WPZ/WMB merger was announced, ETE had given the market a further showing of its commitment to the MLP model. On January 26, 2015, about half a year after the consolidated model had been introduced in the energy infrastructure industry, ETE announced that it was streamlining its structure by merging two of its MLPs, Regency Energy Partners and Energy Transfer Partners. The merger was completed on April 30, 2015, a mere two weeks before the WPZ/WMB merger announcement.

Had ETE wanted to adopt the new model, this was the transaction in which it would have done so: it would have absorbed Regency into itself, as WMB announced it was doing with WPZ. Rather, ETE kept its operating subsidiaries as an MLP separate from itself, while retaining its IDRs from them. Just four days into the Class period, an analyst noted that the Regency transaction showed ETE's adherence to the MLP model. Investopedia, *Breaking Down Energy Transfer's Corporate Anatomy (ETE, ETP)* (May 19, 2015).

55. Further, current financial conditions reinforced the strong historical basis for the view that ETE was committed to the common MLP model. Analysts understood that this structure protected ETE from excessive asset impairment that would likely result from direct ownership of additional pipeline assets, such as those on WPZ's balance sheet, during a time when lower energy commodity prices meant lower utilization of the transmission assets held by both ETE and WPZ. Lower energy commodity prices meant lower demand for U.S. sourced energy commodities. That also meant lower transmission utilization of the pipelines and lower cash flows generated by those assets. These adverse conditions would lead to an enhanced risk that the cost of the additional WPZ assets would not be recoverable. As a result, it would have been understood by analysts and market participants that ETE could achieve its objectives of faster growth and higher cash flows by seeking WMB's faster growing general partner assets, the IDRs. ETE did not need the rest of the WPZ units to benefit from WMB's IDRs.

56. In sum, analysts and market participants understood that ETE appreciated the flexibility that came with having separate MLPs; the more value and cash flow growth ETE drove into the MLPs, even greater growth was returned to ETE. At the same time, the MLP structure protected ETE from downside exposure to impairment of assets held by the MLPs.

57. If the WPZ/WMB merger had concluded prior to an acquisition of WMB by ETE, that would mean that ETE's business structure would have to change, as ETE would then be owning what had been WPZ's assets directly, rather than indirectly through an MLP. That is because upon its merger with WMB, WPZ would have given up its MLP status, which would mean that ETE would conduct WPZ's business operations, and own WPZ's assets, directly and not receive the IDR benefits related to having an indirect general partnership interest in WPZ. Put another way, ETE (as successor to WMB) would have to pay for WPZ's assets, without obtaining a significant upside benefit beyond what it would obtain from assuming WMB's right to IDR payments. To any investor or analyst following energy MLPs, this would have been a highly improbable scenario, as ETE had demonstrated, and continued to demonstrate, its commitment to the MLP model rather than the consolidated direct-ownership structure. Earlier knowledge of the ETE proposed acquisition transaction of WMB would necessarily have come with the concomitant understanding that the WPZ/WMB merger was at material risk.

58. In any event, as ETE's subsequent actions make clear, any public disclosure by Defendants of ETE's proposal after their public announcement of the WPZ/WMB merger would have been quickly followed by ETE's public statement of both its continued interest in a merger with WMB and its insistence that such a transaction be conditioned on termination of the WPZ/WMB merger agreement.

59. When ETE revealed a formal merger offer – one that unsurprisingly included a stipulation that it was only interested in acquiring the shares of WMB and not the additional units of WPZ not already owned by WMB – the financial market reacted badly, sending shares of WPZ plunging in value. By reason of the facts alleged above, this loss in value would have occurred earlier if analysts and market participants knew that WMB was also entertaining an

acquisition proposal from ETE when the WPZ/WMB merger announcement was made. It would have been clear to analysts and other market participants that an ETE acquisition proposal would be almost certain to include the cancellation of the WPZ/WMB merger, as ETE would not have wanted to acquire WPZ directly. In addition, ETE would have almost immediately made that point definitively. Thus, WPZ and WMB management materially misled the market when they announced the merger as a "no risk" proposition that had no chance of not occurring, without mentioning that WMB was also considering an acquisition proposal from ETE.

**E. ETE responds to the WPZ/WMB merger agreement**

60. On May 12, 2015, the WMB Board held a special meeting with members of WMB management and WMB's legal and financial advisors. During this meeting, the WMB Board discussed the proposed WPZ/WMB merger in which WMB would acquire all of the public outstanding common units of WPZ in an all stock-for-unit transaction at a ratio of 1.115 shares of WMB common stock per common unit of WPZ. With WMB's ongoing talks with ETE still pending, the WMB Board unanimously approved the WPZ/WMB merger agreement.

61. Later in the day on May 12, 2015, a special meeting of the WPZ Board was telephonically convened. During this meeting, the WPZ Board unanimously approved the WPZ/WMB merger agreement. WMB and WPZ then executed the WPZ/WMB merger agreement.

62. The next day, May 13, 2015, WMB and WPZ issued a joint press release announcing the execution of the WPZ/WMB merger agreement and Defendants discussed the WPZ/WMB merger at the "Analyst Day" without disclosing ETE's interest in WMB, that WMB management had discussions with ETE concerning ETE's acquiring WMB, or that those discussions were ongoing. Upon the news of the announcement and the analysts' digestion of

WMB management's comments, WPZ common units, which had closed at $47.40 per unit the day before, closed at $58.16 per unit with an intraday high of $59.41 per unit.

63. WMB nevertheless continued its consideration of the ETE acquisition. On May 19, 2015, less than a week after the announcement of the WPZ/WMB merger and less than two weeks after Defendants Armstrong and Chappel discussed a combination of WMB and ETE with Mr. Warren and Mr. Welch, Defendant Armstrong received a written offer from Mr. Warren providing that ETE would acquire WMB in an all-equity transaction at an implied price of $64.00 per share of WMB common stock, which represented a 20% premium relative to the closing price of the shares of WMB common stock on May 19, 2015. ETE's offer was explicitly and unsurprisingly conditioned on the termination of the WPZ/WMB merger agreement, and indicated that ETE would agree to a "hell or high water" regulatory standard (*i.e.*, that ETE would commit to undertake any obligations required to obtain federal antitrust or other regulatory approval) in the definitive merger agreement. ETE later stated that "[a]fter the WPZ merger announcement, ETE believed it had no other choice but to provide the detailed terms of its interest to the [WMB] Board."

64. The next day, Defendant Armstrong informed the WMB Board that he had received Mr. Warren's written offer. The WMB Board discussed the letter and the process for reviewing it and decided to further discuss the letter the following day with the benefit of advice from WMB's advisors.

65. On May 21, 2015, the WMB Board held a meeting with members of WMB management and representatives of WMB's financial and legal advisors. The WMB Board determined that Defendant Armstrong should inform Mr. Warren that ETE's proposal had been received and that the WMB Board would carefully consider it.

66. On June 10, 2015, Mr. MacInnis, WMB's chairman, received a letter from Mr. Warren, reiterating ETE's proposal to acquire WMB. The letter stated that representatives of ETE expected to hear from representatives of WMB by the end of the week.

67. On June 18, 2015, the WMB Board received another letter from ETE, in which ETE again reiterated its proposal to acquire all of the outstanding shares of WMB common stock, contingent on the termination of the WPZ/WMB merger agreement. The letter indicated that it would be ETE's last attempt to engage in a non-public discussion regarding a mutually negotiated transaction, requested that WMB deliver a complete and substantive response by 9:00 a.m. ET on June 22, 2015, and stated that if WMB failed to do so, then ETE would publicize its proposal to WMB stockholders and would take its proposal directly to WMB stockholders.

**F. The truth emerges about ETE's pursuit of WMB**

68. On June 20, 2015, a special meeting of the WMB Board was convened with members of WMB management and representatives of WMB's legal and financial advisors. Under pressure from ETE, the WMB Board authorized management to publicly announce that it was commencing a process to explore a range of strategic alternatives and to communicate to ETE that its proposal did not provide an adequate basis on which to begin discussions regarding a potential transaction as it significantly undervalued WMB.

69. Although the WMB Board authorized management to announce that WMB was "commencing" the process to explore strategic alternatives, as alleged above, that process in fact had started much earlier and was ongoing even as the WPZ/WMB deal was announced. In ***December 2014,*** the WMB Board had requested that members of WMB management and representatives of Barclays prepare an overview of ETE and its affiliates and that they prepare a review of other strategic opportunities available to WMB. And, in ***January 2015***, the WMB Board had instructed members of WMB management to formally retain Barclays to review and

advise on strategic alternatives, including a potential sale of WMB. And as alleged above, at the time WMB retained Barclays to review and advise on strategic opportunities, ***discussions were already taking place with ETE concerning an acquisition of WMB.*** This background was not disclosed when Defendants announced the plans for a WPZ/WMB merger.

70. On June 21, 2015, Defendant Armstrong sent Mr. Warren a letter that communicated the message authorized by the WMB Board. Defendant Armstrong informed Mr. Warren that ETE's proposal to acquire WMB for an implied price of $64 per WMB share undervalued WMB. Notably, WMB ultimately entered into a merger agreement with ETE at an implied price of $43.50 per WMB share.

71. Later in the day on June 21, 2015, WMB issued a press release announcing that the WMB Board had authorized a process to explore a range of strategic alternatives following receipt of an unsolicited proposal to acquire WMB in an all-equity transaction at an implied price of $64.00 per share of WMB common stock. The press release did not identify ETE as the maker of the unsolicited acquisition proposal.

72. In response, in the early morning of Monday, June 22, 2015, ETE issued a press release that informed the public, including WPZ unitholders, that ETE "ha[d] made multiple attempts over an almost 6-month period to engage in meaningful, friendly dialogue with the senior management of [WMB] regarding a proposed merger [between ETE and WMB]." ETE stated that, as a result of the announcement of the proposed WPZ/WMB merger, it "felt compelled to send its written [merger] offer to [WMB] in an effort to bring ETE's interest to the attention of the [WMB] Board and to outline what ETE believes is a more compelling transaction than the proposed merger between [WMB] and WPZ." ETE stated that "[a]fter the WPZ merger announcement, ETE believed it had no other choice but to provide the detailed

terms of its interest to the [WMB] Board." Further, ETE stated that its interest in WMB was contingent on WMB's terminating its merger agreement with WPZ.

73. In publicly announcing that its offer to acquire WMB was contingent on the cancellation of the WPZ/WMB merger, ETE made clear that the reason was its adherence to the MLP model. Thus, in discussing the advantages of its proposed acquisition of WMB in its June 22, 2015, press release, ETE specifically noted the benefit of WMB's participation in ETE's "shared service model" – meaning ETE's providing management services to its several MLPs – and the value of ETE as a GP managing the operations of WPZ as an MLP.

**G. The price of WPZ common units falls immediately on the revelation of ETE's months-long pursuit of WMB**

74. WPZ investors, surprised by the ETE press release, reacted immediately to the revelation of ETE's interest in WMB and the risk it presented that WMB would terminate its merger agreement with WPZ. The price for WPZ common units dramatically fell 7.6% on this material news, from a $53.14 per unit closing price on June 19, 2015 to a $49.10 per unit closing price on June 22, 2015.

75. WPZ investors drove down the price of WPZ common units because it was evident that WMB shareholders would not approve the WPZ/WMB merger, and it was unlikely that a vote by shareholders of either entity would be scheduled, so long as there was a basis for serious consideration of an ETE acquisition transaction. And WMB's months-long consideration of such a proposal, at the management and board level, internally and in repeated discussions with ETE, reflected WMB's view, one shared by many analysts after ETE's initial offer was made public, that there were attractive reasons for proceeding with such a proposal, sufficient to provide confidence as to the likelihood of eventual agreement at a mutually acceptable price. Moreover, it was likely that upon such agreement, WMB would terminate theWPZ/WMB

merger before the WPZ vote that Defendants had earlier assured WPZ investors was an event as to which there was "no risk," a contingency that ETE required to go forward with its merger proposal. Indeed, when in fact the WMB Board approved a subsequent ETE offer, it then terminated the WPZ/WMB merger agreement before WPZ unitholders were able to vote on it.

76. As analyst Gordon Haskett Research Advisors noted in a June 22, 2015 report, the announcement of ETE's interest in WMB "looks to be a worst-case mess for anyone who may have shorted WMB and gone long WPZ after" the announcement of the WPZ/WMB merger, in reliance upon the statements of the Defendants highlighting the WPZ/ WMB deal.

77. Analysts noted the reasons the ETE acquisition would be attractive to WMB shareholders, such that it was likely to be approved by them. In a report dated June 23, 2015, entitled *ETE/WMB: Birth of a Midstream 'Super Major'?*, Wells Fargo stated:

> The news should be a catalyst for WMB. The deal would enable shareholders to realize immediate value and upside via ownership in ETE/ETC. Given Energy Transfer's expansive footprint and organic growth portfolio, the deal would enhance WMB's scale, provide exposure to assets across the natural gas value chain, and improve the company's long-term growth prospects.

78. The WMB shareholders' preference for the ETE offer over the proposed WPZ/WMB merger was also reflected in the immediate and substantial rise in the share price of WMB stock on June 22, 2015, the day ETE's offer was made public, from $48.34 to $60.86 per share, even though WMB management claimed that the ETE offer undervalued WMB.

79. Analysts also recognized that the premium ETE offered to pay made the acquisition a better option for the WMB shareholders. For example, on June 22, 2015, *Reuters* published the following article:

> *Energy Transfer Offer may be Williams' Best Option – Analysts*
>
> HOUSTON, June 22 (Reuters) - Energy Transfer Equity's unsolicited $48 billion offer for Williams Companies Inc. through

> a corporate structure with tax advantages may be the U.S. pipeline company's best option as potential bids from rivals are complicated by possible antitrust issues and the deal's rich price, investors and analysts said on Monday.

80. Similarly, Investopedia reported on June 24, 2015:

> Energy Transfer Equity has made an extremely generous buyout offer for Williams. In fact, stockholders should be slightly concerned that the company might overpay considering the valuation of several peers in the midstream space. It's hard to understand what Williams Cos. management sees when it says the offer undervalues its company. If Williams demands a higher premium for its shares, then Energy Transfer might want to consider walking away.

**H. WMB terminates the WPZ/WMB merger agreement**

81. On September 25, 2015, a special meeting of the WMB Board was convened with members of WMB management and WMB's legal and financial advisors. During that meeting, the WMB Board authorized and instructed members of WMB management and WMB's legal and financial advisors to finalize the terms of transaction documents for the potential ETE transaction substantially consistent with the terms set forth in ETE's most recent proposal and authorized Mr. MacInnis to communicate the foregoing to Mr. Warren. Defendant Armstrong opposed the WMB Board's decision to approve the ETE deal.

82. Later in the day on September 25, 2015, WMB provided written notice to WPZ that the WMB Board intended to change its recommendation of the WPZ merger agreement. On September 27, 2015, the WPZ Board agreed to terminate the WPZ merger agreement in exchange for an increase in the termination fee payable thereunder from $410 million to $428 million through a waiver of Williams GP's IDRs. The true impact of the termination fee on WMB was far less than the $428 million, however, because WMB owned 60% of WPZ.

## V. MATERIALLY MISLEADING STATEMENTS AND OMISSIONS

83. At the May 13, 2015, "Analyst Day" conference, Defendants both made misstatements of material fact and omitted to state material facts necessary in order to make statements they made not false and misleading, in the light of the circumstances under which those statements were made.

84. Defendant Chappel stated, at the May 13, 2015, "Analyst Day" conference also attended by Defendant Armstrong, that there were no known circumstances that would prevent the completion of the WPZ/WMB merger: ***"There's no risk around the WPZ vote because Williams has majority of the votes, so the outcome of the WPZ vote is already known."*** In fact, Defendants knew – and failed to disclose at that conference or elsewhere – that, far from the WPZ/WMB merger's being a "no risk" proposition, WMB was at that very time actively considering a proposal by ETE to acquire WMB that, for the reasons alleged above, would in all probability include the termination of the WPZ/WMB merger. Thus, the representation that the WPZ/WMB merger was a "no risk" proposition was false and misleading, as WMB's ongoing discussions with ETE concerning its acquisition of WMB presented a material risk that the WPZ/WMB merger would be cancelled.

85. Strengthening that misleading impression of no consummation risk, Defendant Armstrong and Defendant Chappel both spoke at that same program of the WPZ/WMB merger in the past tense, as something that had already been accomplished. Thus, Defendant Armstrong referred to the WPZ/WMB merger as "the transaction we just got ***done***,"[2] a transaction that had

[2] Defendant Armstrong's full statement was, "we couldn't be more excited about where we are, and the transaction we just got done."

been "***completed***,"[3] and a transaction that had been "***finished***" and was "***done***."[4] Defendant Chappel said that "the transaction ***enabled*** us to extend the duration of our high dividend growth" and that "[w]e ***have an enhanced growth profile*** as a result of this lower cost of capital and the incentive – the absence of incentive distribution rights, which ***were*** a nice benefit to Williams but really ***increased*** the cost of capital at WPZ, and that ***was*** really our capital raising vehicle in a ***prior form***." These statements were false and misleading in that they presented the WPZ/WMB merger as a "done" deal, when in fact Defendants knew, or were reckless in disregarding, that the completion of the WPZ/WMB merger was endangered by the proposed acquisition of WMB by ETE.

86. Similarly, Defendant Armstrong stated at the program, without caveat or condition, that "[t]he WPZ unitholders ***will*** enjoy the benefits of that premium" to be paid to WPZ as part of the WPZ/WMB merger. That statement, particularly when paired with the statement of "no risk," was false and misleading in that it presented the WPZ/WMB merger as a transaction sure to close, when in fact Defendants knew, or were reckless in disregarding, that the completion of the WPZ/WMB merger was endangered by the proposed acquisition of WMB by ETE.

87. When making the statements alleged above, all of which led investors to believe that the WPZ/WMB merger had no consummation risk, Defendants omitted to state a material fact – *i.e.*, WMB's ongoing acquisition discussions with ETE – necessary in order to make those

---

[3] Defendant Armstrong's full statement was, "we completed what I think is a fantastic transaction for us."

[4] Defendant Armstrong's full statement was, "So this presentation, as you'll see today, was designed without this transaction being done. The one supplement you'll see to that is in Don [Chappel]'s presentation, but the rest of them you'll see was done without us having the knowledge that we would get that transaction finished."

statements not false and misleading, in the light of the circumstances under which they were made.

## VI. MATERIALITY

88. The acquisition proposal made by ETE to WMB was a material fact at the time WMB and WPZ announced the WPZ/WMB merger, in light of Defendants' assurance that the WPZ/WMB merger was a "no risk" proposition, because, as alleged in detail above, there was a material likelihood that the ETE acquisition would be consummated balanced against the magnitude of the transaction. The transaction had a high magnitude for WPZ because, as alleged in detail above, its consummation threatened to – and in the event, did – require the cancellation of the WPZ/WMB merger. It had a material likelihood of consummation given, as alleged in detail above, the lengthy, intensive, and continuing Board consideration it had received at that time, including consultation with professional advisors, as well as ETE's patient, longstanding (over approximately 15 months), and continuing efforts to interest WMB in a possible acquisition by ETE, indicating a likely willingness to pay an attractive premium to WMB shareholders.

## VII. LOSS CAUSATION

89. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. These statements artificially inflated the price of WPZ securities and operated as a fraud or deceit on the Class.

90. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on June 22, 2015, the price of WPZ common units fell precipitously. The declines in the price of WPZ securities pled herein were a direct result of the nature, extent, and impact of Defendants' prior false and misleading statements and omissions being revealed to

investors and the market. The timing and magnitude of the price decline of WPZ common units negate any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct. There can be no dispute that the decline in WPZ's common-unit price is attributable to disclosures as to WMB's long-standing consideration of an alternative corporate acquisition proposal that was necessarily preclusive of the WPZ/WMB merger and that, in some form, had a material likelihood of succeeding. As analyst Gordon Haskett Research Advisors noted in a June 22, 2015 report, the announcement of ETE's interest in WMB "looks to be a worst-case mess for anyone who may have shorted WMB and gone long WPZ after" the announcement of the WPZ/WMB merger, in reliance upon the statements of the Defendants highlighting the WPZ/WMB deal.

91. As a result of their purchases of WPZ securities (*i.e.*, common units) during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**VIII. CLASS ACTION ALLEGATIONS**

92. Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired the publicly traded securities (*i.e.*, common units) of WPZ during the Class Period ("the Class"). Excluded from the Class are Defendants and their officers, directors, and family members, as applicable.

93. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of February 13, 2015, there were 586,694,683 WPZ common units outstanding, owned by hundreds or thousands of investors.

94. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e) Whether the price of WPZ common units was artificially inflated by such misrepresentations and omissions;

(f) Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g) The extent of damage sustained by Class members and the appropriate measure of damages.

95. Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

96. Lead Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

97. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR

98. Defendants' false and misleading statements issued during the Class Period were not "forward looking."

99. Even if Defendants' statements issued during the Class Period were deemed forward looking, Defendants' "Safe Harbor" warnings accompanying such statements were ineffective to shield those statements from liability.

100. Defendants are also liable for any false or misleading statements pleaded herein that are deemed forward-looking because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of the Entity Defendants who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

101. Further, having chosen to disclose the terms of the WPZ/WMB agreement, tout the benefits of the merger to the WPZ unitholders, and boost investor confidence that the merger would be completed, Defendants had a duty to make a complete disclosure concerning WMBs consideration and evaluation of strategic alternatives, including its discussions with ETE, and to update, correct or withdraw their statements as information changed. There in fact had been substantial changes which were not reflected in the May 23, 2015, announcement of the WPZ/WMB merger agreement, including that ETE made a firm offer to the WMB Board to

acquire WMB, that the offer was conditioned on the termination of the WPZ/WMB merger agreement, and that WMB was actively evaluating ETE's offer.

## X. PRESUMPTION OF RELIANCE

102. At all relevant times, the market for WPZ's common units was an efficient market for the following reasons, among others:

(a) WPZ common units met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, WPZ filed periodic public reports with the SEC;

(c) WPZ regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) WPZ was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

103. As a result of the foregoing, the market for WPZ common units promptly digested current information regarding WPZ from all publicly available sources and reflected such information in the price of WPZ common units. Under these circumstances, all purchasers of WPZ common units during the Class Period suffered similar injury through their purchase of WPZ common units at artificially inflated prices and the presumption of reliance applies.

104. A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128

(1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material information regarding ETE's pursuit of WMB – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of ETE's pursuit of WMB, as set forth above, that requirement is satisfied here.

## XI. ADDITIONAL ALLEGATIONS OF SCIENTER

105. Defendants made the material omissions and misrepresentations complained of herein with scienter in that they knew and/or recklessly disregarded that the above-mentioned announcement of the WPZ/WMB merger agreement, and the statements made in connection with that announced merger, that were issued or disseminated by the Control Person Defendants or by the Entity Defendants, were materially false and misleading when made and omitted material information necessary to make their statements fully accurate and comprehensible. The Defendants knew that their failure to reveal this material information would likely mislead investors, such as Lead Plaintiff and the Class.

106. The fraud alleged in this Complaint did not involve or arise from the actions of lower level employees, nor was it otherwise hidden from the Control Person Defendants. To the contrary, WMB's discussions with ETE concerning ETE's dogged pursuit of WMB were conducted by Defendants Armstrong and Chappel, with the advance approval of WMB's Board. In addition, Defendants Armstrong and Chappel are senior officers and, in the case of Defendant Armstrong, a director of both Williams Partners GP and WMB, which control WPZ (Defendant Chappel is a director of Williams Partners GP, as well as being a senior officer). Thus, the

knowledge possessed by Defendants Armstrong and Chappel can be attributed to both Williams Partners GP and WMB, and consequently to WPZ.

107. Prior to WMB's Board's approving the WPZ/WMB merger, Defendant Armstrong had no fewer than four conversations with senior representatives of ETE concerning a potential transaction between WMB and ETE. One of these conversations was during a dinner meeting with senior ETE representatives that also included Defendant Chappel, which was held less than a week prior to the approval of the WPZ/WMB merger.

108. Defendant Armstrong was also present at numerous WMB Board meetings where ETE's interest in WMB was discussed by the WMB Board and WMB's advisors, as was, presumably, Chappel, given the nature of his senior responsibilities as Chief Financial Officer, all of which were pertinent to the discussion at those Board meetings. These WMB Board meetings included presentations, made by WMB management and WMB's advisors at the request of the WMB Board, concerning ETE's interest in WMB.

109. Defendants were well aware of the difference between the traditional MLP model and the new consolidated model of energy infrastructure business structure. This is shown, among other things, by their decision to switch WMB from the traditional model to the new model. Defendants were further aware of, or recklessly disregarded, based on their numerous discussions with ETE management and from publicly available sources, material information about ETE, its prospective merger partner, demonstrating ETE's commitment to the MLP model, including among other things ETE's merger of its MLPs Regency and Energy Transfer Partners (rather than absorbing them into itself) just before the Class period and during the pendency of ETE's acquisition discussions with WMB.

110. Thus, at the time they made the materially misleading statements and omissions, Defendants knew of, or recklessly disregarded, both the seriousness of WMB's discussions with ETE regarding an acquisition and the fact that ETE would not want the WPZ/WMB merger to proceed if there were to be an ETE acquisition of WMB.

111. These facts, as well as others stated above, establish the strong inference that the Control Person Defendants acted with scienter and, consequently, that the Entity Defendants they controlled did so as well.

**COUNT I**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against All Defendants)**

112. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

113. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase WPZ common units at artificially inflated prices.

114. Throughout the Class Period, the Defendants individually, and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, employed devices, schemes, and artifices to defraud, made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, and engaged in acts, practices and a course of business which operated as a fraud and deceit upon Class members, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

115. The Defendants' false and misleading statements and omissions were made with scienter and were intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and the other members of the Class; (ii) artificially create, inflate and maintain the market for and market price of the WPZ common units; and (iii) cause Lead Plaintiff and the other members of the Class to purchase WPZ common units at inflated prices.

116. By affirmatively making statements to the market that effectively and clearly created the impression that the WPZ/WMB merger agreement was without consummation risk, while failing to inform the market of ETE's months-long pursuit of WMB, its intent to make an attractive offer to acquire WMB, and its lack of interest in acquiring the publicly-held WPZ common units, and making other false statements and material omissions, the Defendants presented a misleading picture of the advantages of investing in WPZ, including its present and future business structure, operations and prospects, as well as current conditions affecting those matters. This caused and maintained artificial inflation in the trading prices of WPZ's publicly traded common units throughout the Class Period and until the truth came out.

117. The Defendants were individually and collectively responsible for making the statements and omissions alleged herein by virtue of having prepared, approved, signed, and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading and/or making direct statements to the investing public as detailed herein.

118. During the Class Period, Defendant Armstrong and Defendant Chappel, as senior executive officers of the Entity Defendants, had access to material adverse non-public information concerning WPZ, its operations, finances, financial condition, and present and future business prospects and structure, and current conditions affecting those matters, by means of

internal corporate documents and conversations and through communications with high-level representatives of ETE. Because of their possession of such information, Defendant Armstrong and Defendant Chappel knew or recklessly disregarded that the adverse facts specified therein had not been disclosed to, and were being concealed from, the investing public.

119. As senior executive officers and/or directors and as controlling persons of the Entity Defendants including WPZ, a publicly traded master limited partnership whose common units were, and are, registered with the SEC pursuant to the Exchange Act, and were, and are, traded on the NYSE and governed by the federal securities laws, Defendant Armstrong and Defendant Chappel had a duty to promptly disseminate accurate and truthful information with respect to WPZ's present and future financial condition and business prospects and structure, and current conditions affecting those matters, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of WPZ's common units would be based upon truthful and accurate information. The Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

120. The Defendants are liable as direct participants in the wrongs complained of herein. As described herein, the Defendants made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and other members of the Class who purchased WPZ common units during the Class Period. There is a substantial likelihood that the disclosure of these omitted facts would have been viewed by the reasonable investor as having significantly altered the total mix of information available about the prospects of WPZ.

121. The Defendants' false statements and omissions were made in connection with the purchase or sale of WPZ's common units.

122. In ignorance of the untrue and misleading nature of the Defendants' statements and/or upon the integrity of the market price for WPZ common units, Lead Plaintiff and the other members of the Class purchased WPZ common units at artificially inflated prices during the Class Period. But for the fraud, they would not have purchased the WPZ common units at artificially inflated prices.

123. The market price for WPZ common units declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by the Defendants, as described above.

124. Lead Plaintiff and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of WPZ common units at artificially inflated prices and the subsequent decline in the price of those common units when the truth was disclosed.

125. This claim is brought within two years after discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

126. By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, and are liable to Plaintiff and the members of the Class, each of whom has been damaged as a result of such violation.

## COUNT II

**Violations of Section 20(a) of the Exchange Act**
**(Against Defendants Armstrong, Chappel, WMB and Williams Partners GP**
**(the "Control Person Defendants"))**

127. Lead Plaintiff repeats and realleges each and every allegation set forth above as if set forth fully herein.

128. As alleged herein, the Defendants are liable to Lead Plaintiff and the Class who purchased WPZ securities based on the materially false and misleading statements and omissions

set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

129. Throughout the Class Period, the Defendants Armstrong and Chappel were controlling persons of Defendants WMB and Williams Partners GP and Defendants Armstrong, Chappel, WMB, and Williams Partners GP were controlling persons of Defendant WPZ within the meaning of Section 20(a) of the Exchange Act, and culpable participants in the fraud detailed herein.

130. The Control Person Defendants, by reason of their status as senior executive officers, directors, general partner, and/or controlling shareholder, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Entity Defendants to engage in the unlawful conduct complained of herein. Because of their positions of control, the Control Person Defendants were able to and did, directly or indirectly, control the conduct of the Entity Defendants' businesses. Defendant Armstrong and Defendant Chappel exercised control over the Entity Defendants during the Class Period by virtue of, among other things, their executive positions with the Entity Defendants, the key roles they played in the Entity Defendants' management, and their direct involvement in their day-to-day operations. Defendant Williams Partners GP exercised control over WPZ by virtue of its position as general partner of WPZ and its right to manage WPZ's operations and activities. Defendant WMB exercised control over WPZ by virtue of its position as 100% owner of Williams Partners GP and its ownership of 60% of WPZ's common units.

131. The Control Person Defendants, because of their positions with the Entity Defendants, controlled and/or possessed the authority to control the representations made on behalf of the Entity Defendants and had the ability and opportunity to prevent their utterance or

cause them to be corrected. Thus, the Control Person Defendants had the opportunity to commit the fraudulent acts alleged herein.

132. Given their individual and collective responsibilities for managing the Entity Defendants throughout the Class Period, Defendants Armstrong and Chappel were regularly presented to the market as the individuals who were responsible for the Entity Defendants' day-to-day business and operations, as well as the Entity Defendants' strategic directions. Defendants Armstrong and Chappel accepted responsibility for assuring the market about the state of, and prospects for WPZ.

133. As a result of the false and misleading statements and omissions alleged herein, the market price of WPZ securities was artificially inflated during the Class Period.

134. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for WPZ common units. Lead Plaintiff and the Class would not have purchased the WPZ common units at the prices they paid, or at all, had they been aware that the market prices for WPZ common units had been artificially inflated by Defendants' fraudulent course of conduct.

135. As a direct and proximate result of the Control Person Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the WPZ common units during the Class Period.

136. By virtue of the foregoing, the Control Person Defendants violated Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

137. WHEREFORE, Lead Plaintiff prays for judgment as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Lead Plaintiff and other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the Class their reasonable Costs and expenses incurred in this action, including attorneys' fees and expert fees;

(d) Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

**JURY DEMAND**

Lead Plaintiff demands a trial by jury.

Dated: August 31, 2016

**FEDERMAN & SHERWOOD**

By: _/s/ William B. Federman_
William B. Federman (Bar No. 2853)
WBF@federmanlaw.com
10205 North Pennsylvania Avenue
Oklahoma City, Oklahoma 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112

*Local Counsel to Class*

**LABATON SUCHAROW LLP**
Joel S. Bernstein
jbernstein@labaton.com
Michael W. Stocker
mstocker@labaton.com
Ira A. Schochet
ischochet@labaton.com
Barry Michael Okun
bokun@labaton.com
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Attorneys for Lead Plaintiff Employees' Retirement System of the State of Rhode Island and Lead Counsel to Class*

**CERTIFICATE OF SERVICE**

I, William B. Federman, hereby certify that the Amended Class Action Complaint was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: August 31, 2016 *<u>/s/ William B. Federman</u>*